**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                              )
ALTOVA GMBH and ALTOVA, INC., )
                              )
               Plaintiffs,    )
                              )    Civil Action
v.                            )    No. 17-11642-PBS
                              )
SYNCRO SOFT SRL,              )
                              )
               Defendant.     )
_____)
```

**MEMORANDUM AND ORDER**

July 26, 2018

Saris, C.J.

**INTRODUCTION**

This case involves a patent dispute between Altova GmbH and Altova, Inc. (collectively, "Altova"), and Syncro Soft SRL ("Syncro Soft"), direct competitors in the market for extensible markup language ("XML")[1] editor software. The patent at issue, owned by Altova, concerns an automatic fix feature for errors in XML coding.

Syncro Soft has moved to disqualify its former law firm Sunstein Kann Murphy & Timbers LLP ("Sunstein") from representing Altova, based on Sunstein's representation of Syncro Soft. The Court has stayed the proceedings pending

---

[1] In computing, XML is a language for encoding documents. See Docket No. 39 at 14.

resolution of the inter partes review of the patent at issue, but the parties have asked the Court to decide the motion to disqualify counsel at this time. After hearing, the Court **ALLOWS** the motion to disqualify Sunstein (Docket No. 20).

## FACTUAL BACKGROUND

### I. The Patent and Accused Product

Altova and Syncro Soft both sell XML editor software, which helps software and website developers with data management, data integration, and writing programs. Docket No. 39 at 11, 13-14. The patent at issue is U.S. Patent No. 9,501,456 ("the '456 Patent"), which is owned by Altova GmbH. Docket No. 12 ¶ 8. The '456 Patent is entitled "AUTOMATIC FIX FOR EXTENSIBLE MARKUP LANGUAGE ERRORS," and is directed to "[m]ethods and apparatus, including computer program products, for an automatic fix for [XML] errors." '456 Patent, at [54], [57]. The patent application was filed on March 15, 2013, and the patent issued on November 22, 2016. '456 Patent, at [22], [45].

The accused product is version 19.0 of Syncro Soft's OXYGEN XML Editor software, which includes a feature called "Quick Fix." See Docket No. 12 ¶ 15. Altova alleges that the Quick Fix feature "helps [users] resolve errors that appear in an XML document by offering Quick Fixes to problems such as missing required attributes or invalid elements." Docket No. 12 ¶ 15. Altova maintains that, via the Quick Fix function, Syncro Soft

2

directly and indirectly infringes at least Claim 1 of the '456 Patent. Docket No. 12 ¶¶ 11-12.

## II. Legal Representation Timeline

### A. Syncro Soft's 2004 Trademark Dispute with Oxygen Media LLC

In October 2004, Syncro Soft received a cease and desist letter from Oxygen Media LLC, which accused Syncro Soft's OXYGEN XML Editor software of trademark infringement and dilution. Docket No. 21 ¶ 2. Syncro Soft sought legal counsel to respond to the cease and desist letter. Docket No. 21 ¶ 2. Lee Carl Bromberg of Bromberg Sunstein LLP, the firm that would later become Sunstein, first agreed to represent Syncro Soft in connection with this matter in early November 2004. Docket No. 21-1 at 2.

The 2004 engagement letter specified that Syncro Soft was granting the law firm "power of attorney to execute on [Syncro Soft's] behalf all documents relating to the matters for which [the firm has] been retained." Docket No. 21-1 at 2. The letter also included a paragraph regarding possible future conflicts of interest. It read:

> Occasionally, because of ethical considerations, attorneys are required to withdraw from the representation of clients. While we do not anticipate having to withdraw from your representation, you should be aware that because our firm represents a large number of clients, there is always a possibility that a conflict of interest might develop which would force us to

>  cease representing you. However, we would only do so upon reasonable notice.

Docket No. 21-1 at 3. Stefan Vasile, Syncro Soft's Chief Executive Officer, executed the agreement on November 2, 2004. Docket No. 21-1 at 5. The dispute with Oxygen Media LLC was resolved to Syncro Soft's satisfaction through attorney correspondence. See Docket No. 21 ¶ 4.

    **B.   Syncro Soft's 2009 Copyright and Trade Dress Dispute with Altova**

Then, in April 2009, Syncro Soft received another cease and desist letter -- this time, from Altova. See Docket No. 21-2 at 2-4. The 2009 letter accused Syncro Soft of infringing on Altova's copyrights and misappropriating Altova's "distinctive trade dress." Docket No. 21-2 at 3. Specifically, Altova claimed that version 10.1 of Syncro Soft's OXYGEN XML Editor software "copied the look and feel of [Altova's] XMLSpy schema visualization and user interface." Docket No. 21-2 at 3.

Sunstein again represented Syncro Soft in its dispute with Altova. Docket No. 21 ¶ 10. Throughout the representation, Vasile provided Sunstein attorney Joel Leeman with information about how OXYGEN XML Editor software functioned and hyperlinks to images and a video showing the product's operation on publicly available websites. Docket No. 21 ¶ 12.

Leeman and Altova's counsel exchanged correspondence related to Syncro Soft's software, and Altova demanded that

4

Syncro Soft make changes to the OXYGEN XML Editor interface. See Docket No. 21-5; Docket No. 21-7; Docket No. 21-9; Docket No. 21-11. Syncro Soft did, in fact, make some changes to its software in response to Altova's letters, releasing versions 10.2 and 10.3 of OXYGEN XML Editor. See Docket No. 21-5 at 3-4; Docket No. 21-9 at 7. The final letter Sunstein received from Altova's counsel with regard to this matter was dated June 25, 2009. Docket No. 21-11 at 2. The letter stated that Altova would "review the new release of Oxygen 10.3 and continue to monitor this situation." Docket No. 21-11 at 2.

    **C.**    **Syncro Soft's Trademark Registration**

Sunstein also assisted Syncro Soft with its 2010 U.S. Trademark Registration No. 2,932,884. Docket No. 21 ¶ 26. The firm continued to provide trademark maintenance assistance for Syncro Soft through 2014. Docket No. 28 at 7.

    **D.**    **Sunstein Begins Representing Altova in 2011 in Trademark Matters**

In around October 2011, Sunstein began to represent Altova in trademark matters, which were not adverse to Syncro Soft. Altova had not yet filed its application that would become the '456 Patent. Docket No. 28 at 6. On behalf of Altova, Sunstein sued Embarcadero Technologies, Inc., in June 2012, asserting trademark infringement, unfair competition, disparagement, and copyright infringement claims. Docket No. 21 ¶ 37. Sunstein did

5

not inform Syncro Soft that it was representing Altova in an intellectual property dispute at that time. Docket No. 21 ¶ 38.

### E. Conflict

From 2011 to 2017, Sunstein represented both Syncro Soft and Altova without incident. See Docket No. 28 at 7. Then, Altova approached Sunstein in late June 2017 regarding this patent dispute involving Syncro Soft. Docket No. 28 at 7. To attempt to avoid the conflict of interest, Sunstein terminated its relationship with Syncro Soft on July 6, 2017. See Docket No. 28 at 8; Docket No. 21-13 at 2. The letter from attorney Leeman to Vasile stated that Sunstein "encounter[s] potential conflicts in relation to other clients' work that [it] would like to undertake and that these other clients would like [it] to undertake." Docket No. 21-13 at 2. Leeman also wrote that Sunstein "believe[s] it is inappropriate to require [its] existing or potential clients to retain separate counsel in any matter that might be adverse to Syncro Soft." Docket No. 21-13 at 2. The letter did not request Syncro Soft's consent to allow Sunstein to represent Altova in litigation against Syncro Soft. See Docket No. 21-13 at 2.

Vasile responded to Leeman's letter on July 11, 2017. Docket No. 21 ¶ 32. He wrote that he understood there to be "a potential conflict of interest that might develop and matters that might be adverse to [the] company" and expressed concern

about "these possible legal issues." Docket No. 21-15 at 26. Vasile also said that Syncro Soft was "currently not aware of any such legal issues that could affect" the company. Docket No. 21-15 at 26. Syncro Soft did not consent to Sunstein's representation of Altova in this matter. Docket No. 21 ¶ 34.

"[T]o avoid the potential or appearance of using confidential information to Syncro Soft's disadvantage," Sunstein erected an ethical wall so that three attorneys -- including Leeman -- would not have access to any of Syncro Soft's files. Docket No. 28 at 8. Sunstein then filed this action on Altova's behalf against its prior client Syncro Soft on August 31, 2017. See Docket No. 1.

## DISCUSSION

### I. Which Rule of Professional Conduct Applies

Syncro Soft argues that Sunstein should be disqualified because the firm violated Rule 1.7 of the Massachusetts Rules of Professional Conduct,[2] which governs conflicts of interest among current clients, by representing Altova in a matter adverse to Syncro Soft. Alternatively, if the Court finds that Syncro Soft was not Sunstein's then-current client, Syncro Soft asserts that

---

[2] Attorneys practicing in this district must comply with the ethical requirements embodied in the Massachusetts Rules of Professional Conduct. L.R. 83.6.1(a).

7

Sunstein should still be disqualified pursuant to Rule 1.9, which lays out a lawyer's duties to former clients.

Altova disclosed its patent dispute with Syncro Soft to Sunstein in late June 2017, and terminated its relationship with Syncro Soft on July 6, 2017. Thus, Altova does not (and cannot) seriously dispute that Syncro Soft was Sunstein's "current client" at the time the conflict of interest arose. See Markham Concepts, Inc. v. Hasbro, Inc., 196 F. Supp. 3d 345, 348-49 (D.R.I. 2016) (holding that terminated client was a current client for purposes of a motion to disqualify where relationship was terminated five days before law firm hired new attorneys and assumed conflict).

Some courts have adopted the judicially created "hot potato" doctrine in their conflict of interest analysis by holding that lawyers should, as a general matter, remain loyal to their current client and decline to take on a new, conflicting representation. See Markham, 196 F. Supp. 3d at 349 (applying doctrine); Picker Int'l, Inc. v. Varian Assocs., Inc., 670 F. Supp. 1363, 1365-66 (N.D. Ohio 1987) ("A firm may not drop a client like a hot potato, especially if it is in order to keep happy a far more lucrative client."). The Supreme Judicial Court has recently declined to reach the question of whether the hot potato rule applies in Massachusetts. See Bryan Corp. v. Abrano, 52 N.E.3d 95, 101 (Mass. 2016). Because the breach of

8

the duty of loyalty is clear, this Court need not consider the hot potato doctrine to reach the conclusion that an attorney may not avoid the strict requirements of Rule 1.7 by simply dropping a present client to convert it into a former one. Such an interpretation of Rule 1.7 would render meaningless the duty of undivided loyalty a lawyer owes to current clients. See Markham, 196 F. Supp. 3d at 349. For purposes of the conflict analysis, Rule 1.7 applies.

## II. Whether Sunstein Violated Rule 1.7

A "concurrent conflict of interest" exists in two possible scenarios: if (1) "the representation of one client will be directly adverse to another client," or (2) "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Mass. R. Prof. C. 1.7(a). Under certain conditions, a lawyer may continue to represent a client despite a concurrent conflict of interest, but must obtain written informed consent for the representation from every affected client. See Mass. R. Prof. C. 1.7(b); see also Mass. R. Prof. C. 1.7 cmt. 6 ("[A]bsent consent, a lawyer ordinarily may not act as an advocate in one matter against a person the lawyer represents in some other matter.").

Rule 1.7 "serves as a 'prophylactic [measure] to protect confidences that a client may have shared with his or her attorney . . . [and] safeguard[s] loyalty as a feature of the lawyer-client relationship.'" Maling v. Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, 42 N.E.3d 199, 202 (Mass. 2015) (quoting SWS Fin. Fund A v. Salomon Bros., Inc., 790 F. Supp. 1392, 1401 (N.D. Ill. 1992)) (alteration in original). Particularly important in a case like this one is the duty of loyalty. See Mass. R. Prof. C. 1.7 cmt. 6 ("Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent."); Bryan Corp., 52 N.E.3d at 101 (stating that duty of loyalty "forms the bedrock of the attorney-client relationship"). And when Sunstein agreed to represent Syncro Soft, the firm likewise agreed to uphold its duty of undivided loyalty. See Bryan Corp., 52 N.E.3d at 104.

Sunstein concedes that its representation of Altova in this patent dispute was "directly adverse" to Syncro Soft back in June and July of 2017. See Docket No. 28 at 9-10. It states: "Syncro Soft faults Sunstein for not disclosing Altova's potential lawsuit to Syncro Soft, but Sunstein could not do so without violating its duty to Altova." Docket No. 28 at 11-12. As Sunstein acknowledges, it could not simultaneously uphold its duty of loyalty to Syncro Soft and its duty of confidentiality

10

to Altova between late June and July 6, 2017, so it withdrew from representing Syncro Soft only. It points out that in the 13-year relationship, Sunstein had billed Syncro Soft for less than 50 hours of work. Still, although Syncro Soft was not a lucrative client, it had still been a client for a long time. Sunstein's course of action was not the appropriate one:

> [W]here circumstances arise such that a reasonable lawyer would believe that the actions required to provide competent representation of one client would render the client's interests adverse to those of another client of the lawyer, the proper course of action is to disclose the conflict and obtain the informed consent of both clients, or withdraw from representation.

Bryan Corp., 52 N.E.3d at 103.

But Sunstein argues that its decision to withdraw from representing Syncro Soft is allowed under Comment 5 to Rule 1.7 because the conflict was unforeseeable. That comment acknowledges that "[u]nforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation." Mass. R. Prof. C. 1.7 cmt. 5. It also provides for the possibility of continued representation of one client when an unforeseeable conflict arises: "Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations . . . to avoid the conflict." Id.

11

It is true that Sunstein did not know about an existing conflict when Altova became its client in 2011, a fact that distinguishes this case from much of the caselaw. See Markham, 196 F. Supp. 3d at 348 (firm assumed conflict by hiring new lawyers); Picker, 670 F. Supp. at 1364 (conflict arose through firm merger); see also Bryan Corp., 52 N.E.3d at 100-01 (concluding that firm "acting as a reasonable lawyer, should have known" that conflict would arise). However, Rule 1.7 also "encompasses a lawyer's duty to anticipate potential conflicts." Bryan Corp., 52 N.E.3d at 102 (citing Maling, 42 N.E.3d at 207).

A reasonable lawyer should have known that there was a significant risk that Altova's interests would become adverse to Syncro Soft's concerning their competing XML products no later than November 2016 when Altova's patent issued, and then should have obtained written, informed consent from both clients or withdrawn from representing both parties on that matter. The companies were direct competitors who sold similar XML editor software products. Sunstein knew that Altova vigorously protected its intellectual property rights. In fact, Altova had previously sent Syncro Soft a cease and desist letter related to alleged copyright infringement involving this software. For these reasons, this patent dispute is not the type of unforeseeable development contemplated by Comment 5. See Mass. R. Prof. C. 1.7 cmt. 5.

At the hearing, Sunstein argued that its 2004 engagement letter with Syncro Soft informed the client that the representation might have to be terminated. Docket No. 39 at 29. Specifically, the engagement letter stated "there is always a possibility that a conflict of interest might develop which would force [Sunstein] to cease representing [Syncro Soft]," but it also promised that Sunstein "would only do so upon reasonable notice." Docket No. 21-1 at 3. Sunstein emailed Vasile out of the blue on July 6, 2017, terminating their relationship forthwith without discussion. Sunstein argues it gave "reasonable notice" with respect to the incoming patent suit, so it met its obligations under the engagement letter. I disagree. By undertaking continuing representation in the engagement letter, Sunstein owed Syncro Soft a duty of undivided loyalty during the representation. Sunstein cannot simply choose the more profitable client and drop the other. See Restatement (Third) of the Law Governing Lawyers § 132 cmt. c (2000); see also id. § 121 illus. 5.

The question of whether disqualification is the appropriate remedy remains. "Disqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary." Adoption of Erica, 686 N.E.2d 967, 970 (Mass. 1997) (quoting Freeman v. Chi. Musical Instrument Co.,

689 F.2d 715, 721 (7th Cir. 1982)). Sunstein seeks a less drastic remedy. In Markham, the court suggested that "where one existing firm client decided to sue another firm client," a conflict would be "often beyond the control of the . . . attorneys." 196 F. Supp. 3d at 351. Those particular circumstances "warrant a more sympathetic analysis." Id. While the sympathetic analysis may apply when two unrelated clients engage in an unpredictable dispute, this altercation was foreseeable. Because Sunstein violated its duty of undivided loyalty to Syncro Soft in violation of Rule 1.7, the Court finds in its discretion that disqualification is appropriate in this litigation. See Bryan Corp., 52 N.E.3d at 105.

## **ORDER**

The motion to disqualify the Sunstein firm (Docket No. 20) from representing Altova in this patent litigation against Syncro Soft is **ALLOWED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge